CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
11/10/2026
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

**VALERIE HANNON SMITHERMAN and THOMAS SMITHERMAN,**

Plaintiffs,

v.

**CITY OF LYNCHBURG, VIRGINIA;**

**ISABELLA BARKSDALE, in her individual capacity; and**

**JOHN AND JANE DOES 1–5, in their individual capacities,**

Defendants.

Civil Action No. 6:26cv147

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Valerie Hannon Smitherman and Thomas Smitherman, by counsel, state as follows for their Complaint against Defendants City of Lynchburg, Virginia, Isabella Barksdale, and John and Jane Does 1–5.

## NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Virginia law. It arises from child-protective proceedings that the City of Lynchburg, acting through its Department of Social Services ("LDSS"), began against two parents on the strength of a third-party report about the condition of their home, when LDSS's own photographs of the home showed none of the conditions reported and when the child had never been in the home at all, and then kept going for seven weeks after LDSS's own Deputy Director overturned the agency's finding of neglect.

2. In November 2024, Plaintiffs' newborn daughter, A.S., was a patient in the neonatal intensive care unit of the University of Virginia hospital in Charlottesville, about sixty miles from Plaintiffs' home in Lynchburg. On November 13, 2024, an LDSS investigator who had never seen Plaintiffs' home, had never met or spoken with the child's mother, and had spoken with the child's father once by telephone swore out an affidavit asserting that the home was infested and strewn with animal waste, that the mother had received no prenatal care and had not visited her child, that the mother has cerebral palsy, and that there were "concerns for cognitive delays" for both parents. Each parent holds a doctorate. When she swore to it, LDSS had twelve photographs of the home in its file. They showed clutter. They showed no infestation, no animal waste, no litter boxes, and no cats, and five of them showed the home clean two days earlier. The child the affidavit was meant to protect had never been in the home: she had been in the hospital every day of her life, LDSS knew it, and the affidavit said so.

3. The same day, acting *ex parte*, on its own motion, and on the false affidavit alone, the Lynchburg Juvenile and Domestic Relations District Court (the "J&DR court") took legal custody of A.S. from her parents and awarded it to LDSS.

4. Five days later, LDSS conceded on the record that the parents do not have cognitive delays and that the mother had visited her child. LDSS nonetheless kept Plaintiffs under a preliminary child protective order for more than four months and entered a "Founded" disposition of physical neglect against each of them.

5. In January 2025, LDSS demanded that Plaintiffs undergo counseling that no professional had found they needed. When Plaintiffs, on the advice of counsel, declined to sign a consent form for that counseling, the City charged both of them with criminal contempt of court

for refusing to consent. The protective order did not require anyone to consent to counseling or to sign anything.

6. On February 4, 2025, after an administrative hearing, LDSS's Deputy Director overturned the neglect finding as to both parents. The City was asked in writing to dismiss the court proceedings. It refused. It pressed the contempt charges, subpoenaed Dr. Valerie Smitherman's medical records, and continued to demand that Plaintiffs submit to in-home "services," until March 28, 2025, when LDSS itself moved to dissolve the protective order.

7. Plaintiffs seek compensatory and punitive damages, declaratory relief, and their attorney's fees and costs.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4) because Plaintiffs' claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983, 42 U.S.C. § 12132, and 29 U.S.C. § 794.

9. This Court has supplemental jurisdiction over Plaintiffs' claims under Virginia law pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims.

10. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

11. Plaintiffs do not seek review, reversal, or modification of any judgment of a Virginia court. Every order described in this Complaint was dissolved, vacated, or dismissed before this action was filed, and none resulted in a final judgment against either Plaintiff. Plaintiffs seek damages for Defendants' own conduct in procuring, prolonging, and exploiting those orders.

12. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this district and a substantial part of the events giving rise to the claims

occurred here. Assignment to the Lynchburg Division is proper under W.D. Va. Gen. R. 2(b) because the claims arose in the City of Lynchburg.

## PARTIES

### A. Plaintiffs

13. Plaintiff Valerie Hannon Smitherman, Ph.D. ("Dr. Valerie Smitherman"), is an adult resident of the City of Lynchburg, Virginia. She holds an M.Phil. from the University of Oxford and a doctorate from the University of Bergen in Ancient Greek, and she teaches Latin and Greek. She is the mother of A.S.

14. Dr. Valerie Smitherman has cerebral palsy, a physical impairment that affects her gait and mobility. She cannot walk long distances without assistance or use stairs without adequate railings. Cerebral palsy does not affect her cognition, and no one has ever found that it does. As alleged below, the City nonetheless regarded her as having a cognitive or mental impairment because she has cerebral palsy.

15. Plaintiff Thomas Smitherman, Ph.D. ("Dr. Thomas Smitherman"), is an adult resident of the City of Lynchburg, Virginia. He holds a Magister degree from Lomonosov Moscow State University and a doctorate from the University of Zurich in Comparative Indo-European Linguistics; he speaks, reads, and writes several languages and teaches Russian, Arabic, Ancient Greek, and Proto-Indo-European. He is the husband of Dr. Valerie Smitherman and the father of A.S.

16. A.S. is Plaintiffs' daughter. She was born in November 2024 and is a minor. She is identified by her initials under Fed. R. Civ. P. 5.2(a) and is not a party to this action.

**B. Defendants**

17. Defendant City of Lynchburg, Virginia (the "City"), is a municipal corporation organized under the laws of the Commonwealth of Virginia. The City is a "person" within the meaning of 42 U.S.C. § 1983 and a "public entity" within the meaning of 42 U.S.C. § 12131(1).

18. The City operates the Lynchburg Department of Social Services, which is part of the City's Department of Human Services and also does business as "Lynchburg Human Services." LDSS corresponds on City letterhead bearing the words "The City of Lynchburg" and "Human Services," its employees use City of Lynchburg e-mail addresses, and it is represented in court by attorneys employed by the City. The acts of LDSS alleged in this Complaint are acts of the City.

19. On information and belief, the City, through LDSS, receives federal financial assistance for its child welfare programs and activities, including funds under Titles IV-B and IV-E of the Social Security Act, and received such assistance at all times relevant to this Complaint.

20. Defendant Isabella Barksdale ("Barksdale") was at all relevant times a Child Protective Services investigator employed by the City in LDSS. On information and belief, she is also known as Isabella Phillips. She is sued in her individual capacity. At all relevant times she acted under color of state law.

21. Defendants John and Jane Does 1–5 (the "Doe Defendants") are officials and employees of the City, presently unknown to Plaintiffs by name, who (a) reviewed and approved the "Founded" disposition against Plaintiffs; (b) determined, as LDSS's in-home services staff and their supervisors, that Plaintiffs required counseling and "intensive family preservation" services, and maintained that determination after the Deputy Director overturned the finding of neglect; (c) directed or conducted the January 14, March 11, and March 19, 2025 home visits, meetings, and inspections described below; and (d) decided, or participated in the decisions, to seek contempt sanctions against Plaintiffs and to continue the child-protective proceedings after

February 4, 2025. They are sued in their individual capacities. At all relevant times they acted under color of state law. Plaintiffs will amend this Complaint to name them when their identities are learned.

## FACTS

### C. The Smitherman Family and the Birth of A.S.

22. Plaintiffs have been together for more than twenty years. Before November 2024, neither Plaintiff had any history with Child Protective Services, and neither had a criminal record. LDSS's own records so state.

23. During her pregnancy with A.S., Dr. Valerie Smitherman received prenatal care from a certified nurse-midwife at a women's health practice in Forest, Virginia.

24. On or about November 4, 2024, after an ultrasound at that practice, Dr. Valerie Smitherman was referred to an obstetrician at the University of Virginia hospital in Charlottesville ("UVA"). Plaintiffs left their home in Lynchburg for Charlottesville that evening.

25. A.S. was born at UVA several days later, about a month premature, and was admitted to the neonatal intensive care unit (the "NICU") with serious medical conditions. She had never been to Plaintiffs' home. She had no discharge date.

26. Plaintiffs remained in Charlottesville to be near A.S. Dr. Thomas Smitherman was at A.S.'s bedside daily. Dr. Valerie Smitherman, who was recovering from a cesarean delivery, was discharged from the hospital on or about November 11, 2024. She visited A.S. in the NICU beginning on or about November 9, 2024, and on November 12, 2024 she attended A.S.'s baptism in the NICU with the family's priest and A.S.'s godmother.

27. While Plaintiffs were in Charlottesville, relatives looked after their home and their one cat. Dr. Thomas Smitherman's family arranged a professional cleaning of the home as a gift to the new parents. A commercial cleaning service cleaned the home on November 11, 2024.

28. Plaintiffs' home had no mouse infestation and was treated monthly by a commercial pest-control service. Plaintiffs had one cat, not "many cats," and two litter boxes, which the relatives caring for the home cleaned daily while Plaintiffs were away. There were no animal feces "all over" the home, and no feces or urine on its floors.

**D. The November 12, 2024 Report**

29. On November 12, 2024, LDSS received a report from a person whose identity LDSS withheld from Plaintiffs. According to LDSS, the report stated that Plaintiffs' home was "unclean" and "not safe for a medically compromised newborn," that it had "a mouse infestation, many cats, cat food containers left out, trash everywhere, environmental hazards, feces and urine on the floors, and unscooped cat litter boxes," and that Dr. Valerie Smitherman "did not get any prenatal care."

30. Before Barksdale swore to the Affidavit described below, LDSS also received twelve photographs of the interior of Plaintiffs' home: seven taken on November 7 and 8, 2024, the day A.S. was born and the day after, and five taken on November 11, 2024, after the professional cleaning. All twelve were taken by Dr. Thomas Smitherman's sister and mother, who were looking after the home while Plaintiffs were in Charlottesville.

31. The seven November 7 and 8 photographs show a cluttered and untidy house: shopping bags, boxes, and packaging on the floors; books and papers stacked on a mantel; unwashed dishes on a kitchen counter; groceries on a folding table; a bathroom in need of cleaning; and ground coffee spilled on a radiator beneath a coffee grinder. They show nothing else. No photograph shows a mouse, a rodent dropping, or any other sign of infestation. No photograph shows animal feces or urine anywhere. No photograph shows a litter box, clean or unclean. No photograph shows a cat, let alone "many cats." No photograph shows garbage or "piles of trash."

32. The five November 11 photographs show the same rooms clean: clear floors, a cleared mantel, clean kitchen surfaces, a clean bathroom, and a litter box with clean litter.

33. The photographs were the only evidence LDSS had about the condition of the home. They showed a house that was untidy on November 7 and 8 and clean on November 11. They did not show a single one of the conditions the report described as making the home unsafe.

34. The report's allegations of a mouse infestation, animal feces and urine, unscooped litter boxes, and many cats were false, and LDSS's own photographs showed none of them.

35. The report did not allege that A.S. had been harmed, that A.S. had ever been in Plaintiffs' home, or that A.S. was about to be discharged to it. It could not. A.S. had never been in the home, and the report itself stated that she was "at the UVA NICU currently" and that she was expected to remain there for a minimum of a few weeks.

36. LDSS assigned the report to Defendant Barksdale.

## E. The November 13, 2024 Affidavit

### *1. What Barksdale Knew and Did Before Swearing the Affidavit*

37. On November 12, 2024, a child-protective worker from Charlottesville went to the NICU. LDSS's record of that visit states that the worker "was able to see the child and her father who was at her bedside."

38. On the morning of November 13, 2024, Barksdale spoke by telephone with a hospital social worker. On information and belief, that social worker had no first-hand knowledge of the condition of Plaintiffs' home and no basis for any opinion about either Plaintiff's cognitive ability.

39. At about 11:00 a.m. on November 13, 2024, Barksdale reached Dr. Thomas Smitherman by telephone. He told her that A.S. was still in the hospital, that there was no

discharge date, and that he and his wife were staying in Charlottesville. Barksdale told him of the allegations, including what her notes call "cognative [sic] concerns" about his wife.

40. When Barksdale asked about A.S.'s medical condition, Dr. Thomas Smitherman told her that it was none of her business and that he would not answer further questions without an attorney. Barksdale responded, in substance, that this was his right but that the City could obtain a court order.

41. Barksdale never spoke with Dr. Valerie Smitherman before swearing the affidavit described below.

42. On information and belief, before swearing the affidavit neither Barksdale nor anyone else from LDSS visited or attempted to visit Plaintiffs' home, spoke with the relatives who were caring for it, spoke with Dr. Valerie Smitherman's prenatal care provider, or took any other step to corroborate the report. LDSS's record of its investigation shows no visit to the home until December 10, 2024.

43. Barksdale did have the twelve photographs. They were in LDSS's file when she swore to the Affidavit. She knew, or by looking at them would have known, that they showed clutter and nothing more, and that five of them showed the home clean on November 11, 2024.

44. About three hours after Dr. Thomas Smitherman declined to answer her questions without an attorney, Barksdale signed and swore to a petition and to an "Affidavit in Support of Petition for Preliminary Protective Order" (the "Affidavit") before an intake officer of the J&DR court. The petition was sworn at 2:17 p.m. and was docketed as Case No. JJ046457-01-00. Barksdale was the petitioner.

45. The petition gave A.S.'s address as Plaintiffs' home in Lynchburg. A.S. was in the hospital in Charlottesville and had never been to that address.

46. The Affidavit was a document separate from the petition. The petition form required a petitioner; it did not require the petitioner to attest personally, under oath, to the truth of the facts alleged. Barksdale chose to do so. In the Affidavit she swore, as a witness, to facts about the condition of Plaintiffs' home, about Dr. Valerie Smitherman's prenatal care and conduct, and about both Plaintiffs' cognitive abilities.

47. In swearing to those facts, Barksdale acted as an investigator and as a complaining witness, in the same way that a police officer acts when swearing to a warrant affidavit. She was not acting as an advocate. The conduct of which Plaintiffs complain in Count I is her investigation, her personal attestation of facts she had not verified and had reason to doubt, and her silence while the court acted on them, not her decision to file a petition.

***2. The False and Unverified Statements***

48. The Affidavit stated, as "[t]he specific facts which necessitate the issuance of a protective order" against Plaintiffs:

> I am seeking approval for a protective order for [A.S.], due to the reported state of the Smitherman home, cognitive abilities of the Smitherman parents, and the medically compromised status of baby [A.S.]. The home is reported to have a mouse infestation, unclean litter boxes, animal feces all over, and piles of trash, in addition to many cats. Valerie Smitherman reportedly got no prenatal care, and is currently not participating in any of her daughter's medical treatment at the UVA NICU- due to lack of trust of medical professionals. Valerie Smitherman also has Cerebral Palsy, and there are concerns for cognitive delays for both she and Mr. Thomas Smitherman.

49. The Affidavit further stated that Dr. Valerie Smitherman "has not been seen or spoken to by medical staff since she gave birth and was discharged," that "[s]he has not come to the NICU," that she "did not get any prenatal care," and that there were "concerns" about Dr. Thomas Smitherman "due to his cognitive capacity."

50. Those four statements were not attributed to any report. Barksdale swore to them as facts.

51. The statements that Barksdale did attribute to a "report" were misleading as made. Barksdale told the court what had been reported about the home. She did not tell the court that LDSS possessed photographs of the home, that she had looked at them or could have, and that they showed none of the reported conditions. A statement that something has been "reported," made by an affiant who holds evidence that the report is unfounded and withholds that evidence from the court, is a half-truth, and a half-truth sworn to a court is a false statement.

52. These statements were false:

(a) Plaintiffs' home did not have a mouse infestation, "unclean litter boxes," "animal feces all over," "piles of trash," or "many cats." The photographs in LDSS's own file showed none of those conditions, and the home had been professionally cleaned two days before the Affidavit was sworn.

(b) Dr. Valerie Smitherman had received prenatal care. Her prenatal care provider is the one who referred her to UVA.

(c) Dr. Valerie Smitherman had been to the NICU, had been seen by medical staff, and had attended her daughter's baptism in the NICU the day before the Affidavit was sworn. She was at her daughter's bedside in the NICU on the day the Affidavit was sworn, when the order it produced took effect.

(d) Neither Plaintiff has a cognitive delay or any cognitive impairment.

53. Barksdale had no first-hand knowledge of any of these matters. She repeated them under oath from a third-party report that the only evidence in LDSS's file did not support, and from second-hand statements, knowing that she had done nothing to verify them, or with reckless

disregard for whether they were true. Her conduct was not negligent or mistaken. She had the means of verification in her file and did not use them, and she swore to facts she had no basis to assert as facts.

54. Barksdale had reason to doubt the statements when she swore to them. She had the photographs, which showed none of the conditions she attributed to the home. LDSS's record showed that Dr. Thomas Smitherman had been at his daughter's bedside the day before. She had spoken with him herself that morning. Nothing in that conversation suggested a cognitive impairment; he declined to be questioned without a lawyer.

55. The Affidavit also recited, among the facts said to necessitate a protective order, that Dr. Thomas Smitherman "replied that he did not wish to speak with me at all without an attorney" and had told Barksdale that his daughter's condition was "none of my business."

***3. The Material Omissions***

56. The Affidavit did not disclose:

(a) that no one from LDSS had seen Plaintiffs' home;

(b) that the allegations about the home came from a single report that LDSS had not corroborated;

(c) that Barksdale had never spoken with Dr. Valerie Smitherman;

(d) that LDSS's own record placed Dr. Thomas Smitherman at A.S.'s bedside the day before;

(e) that LDSS had twelve photographs of the home, that they showed clutter and none of the reported conditions, and that five of them showed the home clean on November 11, 2024; and

(f) that A.S. had never been in the home, was not about to be discharged to it, and could not be exposed to any condition in it while she remained hospitalized.

57. The Affidavit itself acknowledged that A.S.'s condition "will place her at the UVA NICU for the foreseeable next few weeks at minimum." A.S. was under round-the-clock hospital care and was not about to be discharged.

58. The petition form asked the petitioner to "explain why the child would be subjected to an imminent threat to life or health and delay for the provision of an adversary hearing would be likely to result in serious or irremediable injury to the child's life or health." Barksdale checked the box stating that an *ex parte* order "is" necessary and left the explanation blank.

59. There was no emergency. No fact known to Barksdale suggested that A.S. faced any threat to her life or health that would arise before Plaintiffs could be heard.

***4. A Protective Order for a Child Who Had Never Been in the Home***

60. A.S. was born at UVA on November 7, 2024, and had been in the hospital every hour of her life. She had never been in Plaintiffs' home, in the City of Lynchburg, or anywhere outside the hospital.

61. LDSS knew it. The report itself stated that A.S. was "at the UVA NICU currently." A Charlottesville child-protective worker had seen her in the NICU the day before the Affidavit was sworn. Dr. Thomas Smitherman had told Barksdale that morning that A.S. was in the hospital and had no discharge date. Barksdale herself wrote in the Affidavit that A.S.'s condition "will place her at the UVA NICU for the foreseeable next few weeks at minimum."

62. Nothing in the condition of a house sixty miles away could threaten a child in a hospital's intensive care unit. The only connection between A.S. and the home was that she might one day be discharged to it, and no discharge was planned.

63. Every allegation in the Affidavit about the home therefore described, at most, a condition that might someday matter if the home were not cleaned before A.S. came home. LDSS had photographs showing that it already had been.

64. Barksdale nonetheless gave the home as A.S.'s address, swore that an *ex parte* order was necessary to protect A.S. from an imminent threat, and asked the court to act without hearing from the parents.

### *5. The Disability-Based Allegations and Demands*

65. The Affidavit identified the "cognitive abilities of the Smitherman parents" as one of three reasons for seeking a protective order.

66. The Affidavit cited Dr. Valerie Smitherman's cerebral palsy as a fact supporting the petition, in the same sentence as the asserted "concerns for cognitive delays." It identified no way in which cerebral palsy affected her ability to care for her child.

67. In the Affidavit, Barksdale asked the J&DR court to order Plaintiffs, among other things, to "[c]omply with any psychological testing for both parents to evaluate cognitive ability," to "[c]omply with all medical recommendations to include any genetic testing requested by UVA for the parents," to "[c]ooperate with LDSS recommended services," and to "comply with all unannounced home visits and drug screens."

68. Nothing in the report or in the Affidavit alleged that either Plaintiff used drugs.

69. On information and belief, Barksdale has no license or training that would qualify her to assess a person's cognitive ability, and no qualified professional had evaluated either Plaintiff or expressed an opinion about either Plaintiff's cognitive ability or parenting ability.

70. Barksdale and LDSS regarded Dr. Valerie Smitherman as cognitively impaired because she has cerebral palsy, and regarded Dr. Thomas Smitherman as cognitively impaired on the basis of speculation and of his association with his wife.

## F. The *Ex Parte* Removal of A.S. From Her Parents' Custody

71. As typed, Barksdale's petition requested a preliminary protective order under Va. Code § 16.1-253. It did not ask the court to remove A.S. from Plaintiffs' custody.

72. The petition bears a handwritten notation, "Amended to Removal," with a signature and the date 11/13/24. The amendment was made by the court, not at LDSS's request. LDSS opposed the removal at the hearing five days later, and the court-appointed special advocate's later report to the court records that the petition "was amended to an emergency removal order by the court."

73. On information and belief, Barksdale appeared before the judge of the J&DR court *ex parte* on the afternoon of November 13, 2024, and the petition was amended to a removal during that appearance. LDSS's own record states that the judge removed A.S. into LDSS custody "due to the significance of her concerns and medical status of the child."

74. Barksdale said nothing to correct the record. She did not tell the court that A.S. had never been in the home and was not about to be discharged to it; that LDSS's photographs showed clutter and none of the reported conditions, and showed the home clean on November 11; that no one from LDSS had seen the home or spoken with the mother; or that LDSS's own record placed the father at the child's bedside the day before. She did not tell the court that LDSS had not asked for, and did not need, custody of a child who was under round-the-clock hospital care. She let the court act on the Affidavit as written.

75. On November 13, 2024, without notice to Plaintiffs or an opportunity for them to be heard, the J&DR court entered an Emergency Removal Order on its own motion. The order states that the court's finding of an imminent threat to A.S.'s life or health was "[b]ased upon" "the facts alleged in the affidavit filed in this case, which is incorporated by reference." The order recites that the petition was supported by an affidavit and not by sworn testimony.

76. The Affidavit was the only evidence before the court.

77. The Emergency Removal Order awarded temporary legal custody of A.S. to LDSS and directed that Plaintiffs "shall comply with testing requested by UVA NICU for care of the child."

78. The Emergency Removal Order recites that "[t]he child was physically removed from the home prior to the entry of this order, on 11/13/24." That was not true. A.S. had never been in the home.

79. Barksdale had sworn that an *ex parte* order was necessary, that the child was medically compromised, that her mother had not come to see her, and that there were concerns about the cognitive abilities of both parents. An order separating the child from her parents was a natural and foreseeable consequence of those sworn statements.

80. At about 4:30 that afternoon, Barksdale telephoned Dr. Thomas Smitherman and told him that he and his wife no longer had custody of their child. He took the call outside the front entrance of the hospital. Dr. Valerie Smitherman, who had undergone an emergency cesarean delivery six days earlier and had been discharged from the hospital two days before, was at that moment at her daughter's crib in the NICU on the eighth floor.

81. The hospital acted on the Emergency Removal Order the same day. On the whiteboard in A.S.'s room, where the hospital lists a patient's "care partners," Dr. Valerie Smitherman observed that the staff had erased both parents' names and left the space blank. The nurses became noticeably colder toward Plaintiffs, and from that point on, although they were permitted to visit and hold their daughter, the staff told them little about her medical condition or treatment.

82. After telephoning family members and the couple's priest, who had visited the NICU the day before to baptize A.S., Dr. Thomas Smitherman went up to the NICU and told his wife that they had to leave because he had something serious to tell her. He told her in the car, between six and seven o'clock that evening, that LDSS had taken custody of their daughter.

83. LDSS accepted the custody the court had awarded it and exercised it. From November 13 through November 18, 2024, LDSS, not Plaintiffs, held legal custody of A.S. and the authority that goes with it, including the authority to consent to her medical treatment. The hospital treated Plaintiffs accordingly. During those five days Plaintiffs were unable to direct the care of their newborn daughter, who was in intensive care with serious heart and other conditions, and were left to wonder what decisions would be made for her and by whom.

84. The removal had other immediate consequences. Plaintiffs had been invited to stay at the Ronald McDonald House in Charlottesville while A.S. was hospitalized. Once Plaintiffs were the subjects of a child-protective investigation with a pending court date, that invitation was rescinded, because the Ronald McDonald House does not permit persons under child-protective investigation to stay there. From November 13, 2024 until A.S. was discharged in late December, Plaintiffs paid for their own lodging and food in Charlottesville, sixty miles from home, so that they could remain near their daughter.

85. Neither Barksdale nor anyone else at LDSS went back to the court on November 13, 14, or 15 to correct the Affidavit, to inform the court that A.S. had never been in the home, or to ask that the removal be vacated or that the hearing required by Va. Code § 16.1-252 be held sooner. The facts LDSS conceded on November 18, that Plaintiffs do not have cognitive delays, that the mother had visited her child, and that the home had been cleaned, could have been confirmed on November 13 with a telephone call. LDSS instead let the removal stand, and let the order's recital that the child had been "physically removed from the home" stand, until the day of the hearing.

86. Had the Affidavit omitted its false statements and included the facts it left out, it would not have supported a finding that A.S. faced an imminent threat to her life or health, and neither the Emergency Removal Order nor any other *ex parte* order would have been issued.

87. Plaintiffs were deprived of legal custody of their newborn daughter, and of the right to direct her medical care, from November 13 through November 18, 2024, while she was in intensive care.

88. On the strength of the false allegation that Dr. Valerie Smitherman was cognitively impaired, the J&DR court initially appointed a guardian *ad litem* for her, as though she were an incapacitated adult. Once the falsity of that allegation was recognized, the court appointed counsel to represent her instead.

**G. LDSS Concedes the Falsity of Key Allegations Five Days after Removal but Keeps the Family Under Court Order**

89. The J&DR court held a preliminary removal hearing on November 18, 2024. LDSS opposed the removal. The court dissolved the removal order, and legal custody of A.S. returned to Plaintiffs.

90. The restoration of custody was not communicated to the hospital as the removal had been. LDSS had told Plaintiffs of the removal by telephone within hours. No one told the hospital that it had been undone. When Dr. Thomas Smitherman visited the NICU alone on the evening of November 18, 2024, after the hearing, Plaintiffs' names had not been restored to the whiteboard. In their place was a handwritten note reading, in substance, "CPS visited home, mom has CP." No one from LDSS had visited Plaintiffs' home. When the nurse saw Dr. Thomas Smitherman looking at the note, she took it down. On information and belief, the note recorded information conveyed to the hospital by or on behalf of LDSS, and the information it conveyed about Plaintiffs was that the mother has cerebral palsy.

91. On the morning of November 19, 2024, Dr. Thomas Smitherman reported the note to the hospital social worker assigned to A.S. The social worker said she did not know that Plaintiffs' legal custody had been restored. Plaintiffs' names were not restored as A.S.'s care partners until on or about November 21, 2024. For two to three days after the court had returned custody to them, Plaintiffs still did not have, in practice, the standing of parents in their daughter's care.

92. At that hearing LDSS supplemented its Affidavit. The court recorded the supplementation in the order it entered that day: "as alleged in affidavit, as supplemented by LDSS - parents do not have cognitive delays and mother has visited child at UVA."

93. LDSS thus conceded, five days after Barksdale swore to the contrary, that Plaintiffs do not have cognitive delays and that Dr. Valerie Smitherman had visited her daughter.

94. LDSS used the November 18, 2024 hearing to interrogate Plaintiffs. Before the hearing, Barksdale interrupted Dr. Thomas Smitherman's conference with his counsel at the courthouse to question him. After the hearing, Barksdale questioned Dr. Valerie Smitherman at the courthouse with Assistant City Attorney David Mass present, after LDSS had attempted to persuade her to submit to the questioning without her counsel in the room. Neither interview had been scheduled. Neither Plaintiff was advised of the right, under Va. Code § 63.2-1516 and LDSS's own procedures, to record communications with child-protective personnel, and neither could have recorded the interviews in the courthouse.

95. LDSS then used what it had elicited. Its findings record that Dr. Thomas Smitherman "was interviewed at court and verified the authenticity of the photos," and that Dr. Valerie Smitherman "was interviewed at court" and "acknowledged the state of her home condition" and "did not diminish the concern at all." A mother's acknowledgment, extracted at a courthouse five

days after her newborn was taken from her legal custody, that her house had needed cleaning while she was hospitalized became, in LDSS's hands, evidence of neglect.

96. At the same hearing, LDSS and the guardian *ad litem* objected under Va. Code § 16.1-253(F) to the court's making a finding that day on whether the allegations of abuse or neglect had been proven. Because of that objection the court made no finding and set the matter for an adjudicatory hearing.

97. By November 18, 2024, LDSS also knew that Plaintiffs' home had been professionally cleaned. The order entered that day notes "[h]ome being cleaned," and the court-appointed special advocate later reported that the removal was converted to a protective order because LDSS was able to confirm that Plaintiffs did not have cognitive delays and that the home had been professionally cleaned.

98. LDSS did not withdraw its petition. To regain legal custody of their daughter, Plaintiffs did not oppose entry of a Preliminary Child Protective Order. That order, entered November 18, 2024 and modified on December 10, 2024 (as modified, the "Protective Order"), required Plaintiffs to cooperate with services "as requested by LDSS," to admit LDSS, the guardian *ad litem*, and a court-appointed special advocate into their home "at reasonable times selected by the investigatory entity," and to "comply with all services requested by LDSS." It provided that A.S. could be released from UVA "only to a home deemed appropriate by LDSS."

99. Plaintiffs' acquiescence was not consent. The alternative LDSS left them was continued loss of legal custody of a newborn in intensive care. LDSS's own objection under Va. Code § 16.1-253(F) had foreclosed any finding that day on whether the allegations were true, so Plaintiffs could not clear themselves at the hearing; they could only choose between a protective order and no custody. Parents who accept a protective order under threat of continued separation

from their hospitalized child, with no opportunity to contest the allegations against them, have not agreed to anything. LDSS knew that, and it knew that the allegations on which the order rested were, in material part, false.

100. By its terms, the Protective Order prohibited Plaintiffs from purchasing or transporting any firearm, was entered into the Virginia Criminal Information Network, and warned that a violation could result in jail.

101. On the form of each order, the box reciting that the order was issued "[i]n an *ex parte* proceeding" is checked, whereas the box reciting a finding, "[a]fter an adversary hearing," that the order was necessary to protect A.S. is not.

102. In connection with the November 18 and December 10, 2024 hearings, each Plaintiff was bound by a recognizance in the sum of $500 to appear at the next hearing, on pain of forfeiture, a fine, and jail.

103. On November 14, 2024, the day after the Emergency Removal Order, LDSS converted its family assessment of Plaintiffs into a formal investigation. It notified Plaintiffs by letter dated November 18, 2024.

104. The conversion was a direct consequence of the removal. Under Virginia regulations, a report concerning a child who has been taken into the custody of the local department must be investigated rather than assessed. 22 VAC 40-705-50. The Emergency Removal Order had placed A.S. in LDSS's custody, and the investigation followed.

105. The difference matters. By statute, a local department conducting a family assessment shall "[m]ake no disposition of founded or unfounded," and reports handled by family assessment "shall not be entered into the central registry." Va. Code § 63.2-1506(B)(6). Only an investigation can end in a Founded disposition and an entry in the Central Registry. Had the

Affidavit not produced the removal, LDSS's family assessment could have ended only in services that Plaintiffs were free to decline, and in closure of the case if they did. The Founded disposition, the Central Registry listing, the administrative appeal, and the "mental health" findings all followed from, and were made possible by, the removal that Barksdale's Affidavit procured.

106. On December 10, 2024, Barksdale visited Plaintiffs' home for the first time. Her notes record that the kitchen "appeared clean both on the surfaces and the floor" and that "[t]he floors were clean throughout the upstairs as well."

107. At a hearing later on December 10, 2024, LDSS sought to have Plaintiffs submit to psychological evaluations and to counseling outside the home, and the guardian *ad litem* supported counseling. Plaintiffs refused both. Before the hearing, LDSS had made known that if the matter were tried it would seek psychological evaluations, counseling outside the home, and in-home services. Plaintiffs agreed to a continuance and to a modification limited to in-home services, which were described to them as visits to the home, in order to avoid being subjected to psychological evaluation and counseling. LDSS nonetheless pressed for counseling in open court, and withdrew that demand only when Plaintiffs insisted on proceeding to trial.

108. The J&DR court continued the adjudicatory hearing to March 28, 2025, more than four months after the initial hearing, and modified the Protective Order. The order records that "the parties are agreed to extend the adjudication."

109. At the December 10, 2024 hearing, the judge stated in open court that she found it a "red flag" that Plaintiffs would not agree to psychological testing. LDSS recorded the remark in its own file.

110. As modified, the Protective Order required Plaintiffs "[t]o cooperate in the provision of the following reasonable services or programs designed to protect the child's life, health or normal development: in home family services." A handwritten paragraph 8 stated: "Parents shall comply with in home services requested by LDSS."

111. The Protective Order did not define "cooperate," "reasonable," or "in home services." It did not require Plaintiffs to sign any document or to consent to anything.

112. When Plaintiffs agreed to the modification, in-home services were explained to them to mean minimal and unobtrusive visits to their home to monitor conditions while the case was pending.

113. Plaintiffs complied with the Protective Order. They admitted LDSS's social workers, the guardian *ad litem*, and the court-appointed special advocate into their home.

114. A.S. was never present in Plaintiffs' home, or anywhere in the City of Lynchburg, at any time before she was discharged from UVA to her parents' home in late December 2024, more than a month after the petition was filed. Every order LDSS sought concerning the condition of the home was sought while the child was sixty miles away in a hospital.

115. The J&DR court never adjudicated A.S. to be abused or neglected.

**H. The "Founded" Disposition**

116. On December 11, 2024, the day after Barksdale saw for herself that the home was clean, LDSS completed an assessment stating that the home "has been cleaned professionally, and de cluttered, and would be safe currently for the child to discharge home to."

117. The same day, by letter over the names of Barksdale and her supervisor, LDSS notified Plaintiffs that it had made a disposition of "Founded, Level 3 for physical neglect" against each of them, and that their names would be placed in the Virginia Child Abuse and Neglect Central Registry. As educators, Plaintiffs faced severe limitations on their employment opportunities

from placement on the Central Registry. Neither the disposition nor the listing could have been made had the matter remained a family assessment, as it was before the removal.

118. LDSS's written findings rested the disposition in part on Plaintiffs' supposed mental condition. The findings state that "[t]he parents mental health is an additional factor," that Plaintiffs' distrust of "the medical field / government" "bring[s] concern for mental health for them both," and that "[t]he home conditions can be directly correlated to mental health as well." When it made that finding, LDSS had no evidence of any kind that either Plaintiff suffered from any mental illness or disorder. The finding was a complete and utter fabrication.

119. The findings also rested the disposition on Plaintiffs' refusal to be tested: "With the parents refusal to complete psychological testing, it is unknown what their parenting capacity may be, or if any mental health factors can be identified."

120. LDSS's assessment recorded that Dr. Valerie Smitherman "has cerebral palsy herself, but is high functioning physically," that she "is highly educated, and has a PHD from oxford university," and that Dr. Thomas Smitherman "has a PHD from the university of Moscow" and "speaks 8 languages fluently." It nonetheless assessed the family's risk as "HIGH."

121. On information and belief, that "HIGH" rating was produced by a scoring instrument in which the entire score came from three inputs that had nothing to do with anything Plaintiffs had done or failed to do: that the report alleged neglect rather than abuse, that the child was under two years old, and that the child was medically fragile and had a suspected disability. The rating reflected no finding about Plaintiffs' conduct, their home, or their capacity as parents. LDSS nonetheless relied on the family's "HIGH" risk to justify psychological testing, counseling, and the Founded disposition.

122. Even those details were wrong. Dr. Valerie Smitherman's doctorate is from the University of Bergen, and Dr. Thomas Smitherman's is from the University of Zurich. LDSS did not take the care to record Plaintiffs' credentials accurately while it was making findings about their "mental health" and "parenting capacity."

123. LDSS's findings and assessment describe the condition of the home by reference only to photographs "time stamped Nov 7th 2024," the day A.S. was born. They do not mention that those photographs show clutter and none of the reported conditions, or that LDSS's file had held, since before the Affidavit was sworn, photographs of the home taken on November 11, 2024, after the professional cleaning, which showed the home clean two days before Barksdale swore to the Affidavit.

124. No qualified professional had diagnosed either Plaintiff with a mental health condition or found that any such condition affected either Plaintiff's ability to parent. LDSS's statements about Plaintiffs' "mental health" were speculation.

## I. The Administrative Appeal and LDSS's Reversal of Its Own Finding

125. Plaintiffs appealed the Founded disposition under Va. Code § 63.2-1526. LDSS received their request on January 3, 2025, and scheduled a local conference for January 30, 2025.

126. Before the local conference, LDSS produced to Plaintiffs the photographs in its file: twelve in all, seven showing the home cluttered on November 7, 2024, and five showing it clean on November 11, 2024. They were the same twelve photographs LDSS had when Barksdale swore to the Affidavit. All twelve had been taken by Dr. Thomas Smitherman's sister and mother while Plaintiffs were in Charlottesville, and the same photographs were on Dr. Thomas Smitherman's own telephone.

127. At the local conference on January 30, 2025, Barksdale acknowledged that Plaintiffs' home was in suitable condition and had been before A.S. ever entered it, that Plaintiffs do not

have cognitive impairments, and that A.S. had never been denied necessary care. She stated that LDSS was proceeding only on the allegation about the condition of the home before A.S. had ever been in it. She suggested that the photographs showing the home clean had been taken later than November 11, 2024.

128. By two letters dated February 4, 2025, April Watson, Deputy Director of Lynchburg Human Services, stated that, "[a]fter careful review of the record in this case and of the evidence presented at the hearing held on January 30, 2025," she had "decided to overturn the agency's finding of Founded, Level 3, Physical Neglect" of A.S. One letter overturned the finding as to Dr. Thomas Smitherman, and the other as to Dr. Valerie Smitherman.

129. Copies of the Deputy Director's decision were sent to Barksdale, to her supervisor, and to David Mass, the Assistant City Attorney who represented LDSS in the J&DR proceedings.

130. As of February 4, 2025, the City knew that its own agency, after a hearing, had determined that the evidence did not support a finding that either Plaintiff had neglected A.S.

## J. The City Prosecutes Plaintiffs for Contempt and Continues After the Reversal

### *1. The Consent Form and the Contempt Charges*

131. On January 14, 2025, while Plaintiffs' administrative appeal was pending, LDSS's in-home case manager, Haley Dell'Aria, and the court-appointed special advocate visited Plaintiffs' home and presented each Plaintiff with paperwork for the Family Assessment and Planning Team ("FAPT"). The paperwork listed the service to be provided as "intensive family preservation therapy." Each Plaintiff declined to sign. Dr. Thomas Smitherman explained that he had understood the Protective Order to require in-home services directed at A.S., not therapy for her parents, and telephoned his counsel during the visit.

132. During the same visit, Dr. Valerie Smitherman told the court-appointed special advocate that she felt she had been discriminated against because of her cerebral palsy and the common assumption that cerebral palsy is accompanied by cognitive deficit.

133. On January 16, 2025, LDSS presented Plaintiffs' case to the FAPT so that, in LDSS's words, "the in-home family services could be funded." Dr. Thomas Smitherman attended in person. Dr. Valerie Smitherman did not attend in person, but participated by telephone.

134. For the FAPT, LDSS prepared an "Individual Family Service Plan" that requested "[h]ome based counseling services for both parents" and identified Haley Dell'Aria as LDSS's case manager.

135. The plan told the FAPT that the Protective Order required Plaintiffs to "engage in intensive family services (home based counseling)," and described the counseling as "Court Ordered." The Protective Order did not mention counseling.

136. The plan identified no diagnosis, evaluation, or professional recommendation that either Plaintiff needed counseling. It acknowledged that Plaintiffs "dispute the allegations" and that the case had not been adjudicated.

137. The plan also stated: "At the beginning of the CPS investigation there was a lack of cooperation from the parents, leading to court involvement."

138. At the meeting, LDSS disclosed that it intended to require individual counseling for each Plaintiff. The plan had not been offered to Plaintiffs for their consideration.

139. No qualified professional had determined that either Plaintiff needed counseling. LDSS gave no reason for requiring it.

140. At the FAPT meeting, LDSS again presented Dr. Thomas Smitherman with the consent form. On the advice of counsel, he declined to sign it.

141. The purpose of obtaining Plaintiffs' consent was to permit the counseling to be paid for with funds administered under the Children's Services Act. The plan stated that "LDSS is requesting funding for home-based counseling services," and LDSS later told the court that, "as a result of their refusal, those services will not be funded."

142. Dr. Thomas Smitherman asked the convenor of the meeting for the basis of the assessment that counseling was necessary. The convenor replied that no other services were available because of the age of the infant.

143. LDSS knew that Plaintiffs understood the Protective Order differently. In its own words, Dr. Thomas Smitherman "had previously stated to DSS that 'in home family services' only meant that he had to allow DSS to come into the home, as opposed to participating in 'in home' counseling services."

144. On January 16, 2025, the day of the FAPT meeting, Mr. Mass wrote to the judge of the J&DR court on the letterhead of the Office of the City Attorney. The letter stated that "[t]he FAPT approved funding for the parents to undergo in-home counseling, consistent with the Court's order," and that "the child's parents refused to consent to such services and, as a result of their refusal, those services will not be funded." It asked the court to "convene a hearing at the soonest available date, so that the Court can order the proper remedy for this child." The letter did not mention contempt.

145. The court ordered no remedy on the letter. On January 24, 2025, the judge wrote a scheduling notation on it: "Set as soon as DSS files a show cause for violating order." The notation told the clerk when to set a hearing. It did not direct the City to file anything, and the decision whether to seek contempt remained the City's.

146. The City, by Assistant City Attorney David Mass, then filed a Motion for Rule to Show Cause against each Plaintiff under Va. Code § 18.2-456(5), which authorizes summary punishment for contempt. Four contempt charges were docketed: Case Nos. JA042854-01-00 and JA042854-02-00 against Dr. Valerie Smitherman, and Case Nos. JA042855-01-00 and JA042855-02-00 against Dr. Thomas Smitherman.

147. Virginia law recognizes two kinds of contempt. Civil contempt is remedial and coercive: it compels compliance with a specific command of the court, and the person held in contempt may end the sanction at any time by doing what the order requires. Criminal contempt is punitive: it punishes a completed act of disobedience with a fine or jail, results in a conviction, and cannot be purged.

148. The Lynchburg J&DR court requires a party moving for contempt to state which kind it seeks and to cite the statute under which it proceeds. The City chose criminal contempt. It did not ask the court to order Plaintiffs to do anything; it asked the court to punish them for what they had already declined to do.

149. The choice had consequences. A motion for civil contempt would have required the City to identify the command of the Protective Order that Plaintiffs had disobeyed and the act that would purge the contempt. The City could not have done so, because the Protective Order contained no command to consent to counseling or to sign anything. By proceeding under § 18.2-456(5), the City sought punishment for a "refus[al] to consent" without ever identifying an order that compelled consent, and because the charges were criminal, each exposed Plaintiffs to a conviction and a criminal record, and each generated the court costs described below.

150. The only violation the motions alleged was that, "[a]t the conclusion of the FAPT meeting, both of the child's parents refused to consent to such services." The motions did not

allege that the Protective Order required either Plaintiff to consent to counseling or to sign any document.

151. The Protective Order contained no command that either Plaintiff sign a consent form or consent to any plan.

152. Dr. Valerie Smitherman was charged although she had not attended the FAPT meeting in person and had signed nothing there.

153. The contempt charges exposed each Plaintiff to a fine and to jail. *See* Va. Code §§ 18.2-457, 18.2-458.

154. LDSS had no probable cause to believe that either Plaintiff had violated an express command of the Protective Order. Under Virginia law, contempt will not lie for the violation of a duty that arises only by implication. *See Petrosinelli v. People for the Ethical Treatment of Animals, Inc.*, 273 Va. 700 (2007).

155. LDSS sought contempt sanctions to compel Plaintiffs to consent to counseling that it had no lawful basis to require and, on information and belief, because Plaintiffs had refused psychological testing, had questioned LDSS's demands, and had appealed the Founded disposition.

***2. Notice to the City and Its Decision to Proceed***

156. The contempt charges were set for hearing on February 14, 2025, ten days after the Deputy Director's decision.

157. On February 10, 2025, Plaintiffs' counsel spoke with Mr. Mass, who stated that LDSS intended to continue to prosecute the case in the J&DR court notwithstanding the reversal.

158. The same day, Plaintiffs' counsel wrote to Mr. Mass and to the City Attorney, Matthew Freedman, enclosing the Deputy Director's letters. Counsel advised that LDSS's own agency had determined that no neglect occurred, that Barksdale had acknowledged at the local conference

that the home was in suitable condition and that Plaintiffs had no cognitive impairments, and that continuing the case would be a malicious prosecution. Counsel asked the City to dismiss the case.

159. The City did not dismiss the case. On February 12, 2025, Mr. Mass responded that he would "update the Court about what has happened since our last hearing, much of which is favorable to your clients," and that he was "not sure there is much of a dispute about the recent facts." He asked Plaintiffs' counsel for "the cleaning receipts from when the home was cleaned in November," stating: "I would like to verify the day on which the home was cleaned."

160. Three months after Barksdale swore to the condition of Plaintiffs' home, and eight days after its own agency overturned the neglect finding, the City had still not verified when the home had been cleaned.

161. On February 12, 2025, Plaintiffs' counsel notified Mr. Mass in writing that Plaintiffs intended to bring a federal civil rights action.

162. On February 4, 2025, the same day the Deputy Director overturned the neglect finding, the court-appointed special advocate completed her report to the J&DR court for the contempt hearing. Having visited the home twice, she reported that the concerns about the home and about each Plaintiff's cognitive ability had been resolved; that LDSS's continuing concern was Plaintiffs' "resistance and unwillingness to participate in DSS requested services"; that A.S. was gaining weight, receiving regular medical care, and well adjusted to her home; and that Plaintiffs wanted services that would directly support A.S.'s development. She recommended that the Protective Order be dissolved.

163. On February 13, 2025, Plaintiffs moved the J&DR court to dismiss the rules to show cause, to dissolve the Protective Order, and to dismiss the petition.

164. On information and belief, the decisions to seek contempt sanctions and to continue prosecuting the abuse and neglect petition and the contempt charges after February 4, 2025 were made or approved by one or more of the Doe Defendants, including officials with final authority to decide whether the City would bring, maintain, or dismiss those proceedings.

### *3. The Seven Weeks After the Reversal*

165. At the hearing on February 14, 2025, the City pressed the contempt charges. It gave no reason for its demand that Plaintiffs undergo counseling.

166. The J&DR court ruled that Dr. Thomas Smitherman's refusal to sign the consent form violated the handwritten paragraph 8 of the Protective Order, and that paragraph 8 did not limit LDSS to requesting reasonable services. It stated that the facts were sufficient to hold each Plaintiff in contempt, including Dr. Valerie Smitherman.

167. The City procured that ruling by misrepresenting the Protective Order. In its service plan and in its letter to the judge, the City described the counseling as "Court Ordered" and as "consistent with the Court's order." The Protective Order did not mention counseling, consent, or any document to be signed. The City pressed for that ruling although its own Deputy Director had, ten days earlier, overturned the finding of neglect on which the entire proceeding rested, and although its investigator had conceded at the local conference that the home was suitable and that Plaintiffs had no cognitive impairment.

168. The court's statement was made in a summary proceeding without the protections that attend a criminal charge. The court made no finding that either Plaintiff had acted willfully, applied no burden of proof, and entered no finding or judgment. The statement was never reduced to an order, was the subject of a timely motion to reconsider, and was superseded when the charges were dismissed. It was not, and never became, a determination that the charges were supported by probable cause.

169. The J&DR court did not enter a finding of contempt, which left Plaintiffs with no order they could appeal. It directed Plaintiffs to attend a further FAPT meeting, and the charges remained pending over Plaintiffs while they did so.

170. On or about February 24, 2025, Plaintiffs moved the J&DR court to reconsider.

171. On March 3, 2025, LDSS's attorney issued a subpoena *duces tecum* to Dr. Valerie Smitherman's prenatal care provider for "all records regarding the patient Valerie Smitherman," without limit as to time or subject. LDSS had by then stated that it was proceeding only on the allegation about the condition of the home. Plaintiffs moved to quash the subpoena.

172. Plaintiffs subpoenaed Deputy Director Watson to testify in the J&DR proceedings. On or about March 12, 2025, LDSS moved to quash that subpoena.

173. On March 11, 2025, Plaintiffs and their counsel attended a meeting at LDSS's offices, as the J&DR court had directed. LDSS stated that the meeting was neither a new FAPT meeting nor a continuation of an earlier one, but a "service review" meeting to obtain Plaintiffs' consent to services.

174. At the March 11, 2025 meeting, LDSS continued to demand that Plaintiffs cooperate with "in-home family preservation services," under which a provider paid by LDSS would enter Plaintiffs' home, assess the family, and report to LDSS. LDSS's in-home services worker had determined that Plaintiffs required those services at a time when the Founded disposition was in place, and LDSS had not revisited that determination after the disposition was overturned.

175. LDSS could not or would not tell Plaintiffs what the demanded services would consist of or what "cooperation" required. The only basis LDSS gave for demanding them was the allegation that Plaintiffs' home had been unkempt at some point before A.S. was born.

176. On March 11, 2025, Plaintiffs' counsel wrote to Mr. Mass that Plaintiffs would comply with LDSS's demands only because they were being coerced to do so under threat of contempt, and again asked the City to dismiss the petition.

177. On March 19, 2025, LDSS inspected Plaintiffs' home again.

**K. The Proceedings End in Plaintiffs' Favor**

178. On March 28, 2025, the date set for the adjudicatory hearing, LDSS, as petitioner, moved to dissolve the Protective Order. The J&DR court found "that sufficient reason exists for the dissolution of the protective order" and ordered it dissolved.

179. The abuse and neglect proceeding thus ended without any adjudication that A.S. was abused or neglected, and on the City's own motion.

180. The J&DR court dismissed the contempt charges against both Plaintiffs.

181. The J&DR court nonetheless assessed court costs of $101 on each contempt charge. Those costs were a product of the City's election to proceed by criminal contempt. On February 18, 2025, four days after the hearing at which it had declined to enter a finding of contempt, the court's clerk issued a Notice to Pay to Dr. Thomas Smitherman on Case No. JA042855-01-00. The notice described the $101 as owed "for a conviction in this court," recited that costs are imposed on "findings of guilt, prepayments and deferrals of guilt," and warned that he "may be JAILED and fined for failure to pay."

182. Dr. Thomas Smitherman received a second such notice, and Dr. Valerie Smitherman received one, each for $101.

183. Plaintiffs never consented to a deferral of the contempt charges, and no finding of guilt was ever entered.

## L. The City's Policies, Customs, and Decisions

184. The violations of Plaintiffs' rights described in this Complaint were caused by decisions of City officials with final policymaking authority and by the City's policies, customs, and failures to train and supervise.

185. LDSS is a department of the government of the City of Lynchburg. Its director and employees are City employees; its budget is appropriated by the Lynchburg City Council; and its Deputy Director, who decided Plaintiffs' administrative appeal, holds office as "Deputy Director of Lynchburg Human Services," a City department. The Commonwealth prescribes standards for child-protective services, but every decision described in this Complaint was made in Lynchburg by City employees and City attorneys, not by any official of the Commonwealth: whether to swear to the Affidavit, whether to enter a Founded disposition, whether to demand counseling, whether to seek contempt sanctions, whether to continue the proceedings after February 4, 2025, and whether to subpoena Dr. Valerie Smitherman's medical records.

186. The contempt motions, the subpoena, the opposition to dismissal, and the decision to continue the proceedings were acts of the Office of the City Attorney, a department of City government. On information and belief, under the Charter and Code of the City of Lynchburg, the City Attorney is the City's final authority on the conduct of litigation brought in the name of the City or its departments, including LDSS, and no other City official reviews the City Attorney's decisions whether to bring, maintain, or dismiss such litigation. The City Attorney's decisions in that domain are the policy of the City.

187. The City Attorney was personally notified. On February 10, 2025, Plaintiffs' counsel wrote to the City Attorney and to the Assistant City Attorney handling the case, enclosing the Deputy Director's decision and asking that the case be dismissed. The Office of the City

Attorney answered two days later that it would continue, and it did. The City Attorney thereby made, or ratified, the decision to continue the proceedings and the basis for it.

188. On information and belief, the Director of LDSS has final authority within the City over LDSS's dispositions of child-protective investigations and over LDSS's determinations of what services to require of parents. The Founded disposition against Plaintiffs, and LDSS's determination that Plaintiffs required counseling and intensive in-home services, were made or approved under that authority. Those were decisions of a City policymaker, not acts of advocacy before a court.

189. Each of the decisions described in the preceding three paragraphs was a deliberate choice by an official with final authority over the subject, made with knowledge of the facts and of the alternatives. The City is liable for each of them whether or not it reflects a broader custom. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

190. In the alternative and in addition, the decisions to seek contempt sanctions against Plaintiffs for refusing to sign a consent form, to continue prosecuting the abuse and neglect petition after the Deputy Director overturned the finding of neglect, and to continue demanding in-home services and Dr. Valerie Smitherman's medical records were made pursuant to the following customs and practices of the City, which are so persistent and widespread as to have the force of law.

191. On information and belief, the City has a custom or practice of permitting its child-protective investigators to seek *ex parte* orders on the basis of third-party reports that the investigator has not corroborated, or that the evidence in the agency's own file does not support, without visiting the home at issue and without disclosing to the court that the allegations are unverified.

192. On information and belief, the City has a custom or practice of seeking protective orders that require parents to comply with whatever services LDSS may later request, and of enforcing those orders through contempt proceedings prosecuted by the City's own attorneys, including where the order contains no express command that the parent is alleged to have violated.

193. On information and belief, the City has a custom or practice of permitting investigators and in-home services workers who are not qualified to assess cognitive ability or mental health to make judgments about parents' cognitive ability and mental health, to present those judgments to the court as grounds for intervention, and to treat a parent's refusal to submit to psychological testing as evidence of neglect.

194. Barksdale's supervisor reviewed and approved the Founded disposition, including its reliance on Plaintiffs' supposed "mental health" and on their refusal of psychological testing.

195. On information and belief, the City failed to train and supervise its child-protective employees concerning the need to corroborate reports before swearing to them, the duty of candor in *ex parte* applications, and the City's obligations to parents with disabilities under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. The need for that training was obvious, and the City's failure to provide it reflects deliberate indifference to the rights of parents with whom its employees come into contact.

**M. Plaintiffs' Injuries**

196. As a direct and proximate result of Defendants' conduct, Plaintiffs:

(a) lost legal custody of their newborn daughter for five days while she was in intensive care, and had their names erased from the hospital whiteboard as her care partners;

(b) were, for those five days, stripped of the authority to direct their daughter's medical care and left in fear of what would be done with her and to her;

(c) lost their lodging at the Ronald McDonald House and bore the cost of lodging and food in Charlottesville for six weeks while their daughter remained hospitalized;

(d) were subjected to a formal child-protective investigation, a Founded disposition, and listing in the Central Registry, none of which could have occurred had the matter remained a family assessment;

(e) were subject for more than four months to a court order that authorized entries into their home, conditioned their daughter's release from the hospital on LDSS's approval, required them to submit to services chosen by LDSS, and prohibited them from purchasing or transporting firearms;

(f) were listed as having neglected their child, by a Founded disposition that remained in place from December 11, 2024 until February 4, 2025;

(g) were charged with criminal contempt for refusing to consent to counseling, and exposed to fines and jail;

(h) were billed court costs, under threat of jail, on charges that were dismissed;

(i) were bound by recognizance to appear in court on pain of forfeiture, fine, and jail;

(j) were falsely described under oath, in a court filing, as cognitively impaired;

(k) incurred attorney's fees, court-reporter fees, and other expenses in defending the J&DR proceedings and the administrative appeal, and court costs; and

(l) suffered humiliation, anxiety, damage to reputation, and severe emotional distress during the first months of their daughter's life.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983 (Fourteenth Amendment)
### Deprivation of Custody and Familial Integrity Without Due Process of Law
### (Against Defendant Barksdale)

197. Plaintiffs incorporate the preceding paragraphs.

198. Plaintiffs have a fundamental liberty interest, protected by the Due Process Clause of the Fourteenth Amendment, in the care, custody, and management of their child and in the integrity of their family. The Commonwealth recognizes the same right by statute: "A parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child." Va. Code § 1-240.1.

199. Barksdale, acting under color of state law, deprived Plaintiffs of that interest without due process of law. She swore to an Affidavit containing statements that she knew to be false or unverified, or made with reckless disregard for their truth, and omitting facts that she knew would have defeated her application, and she presented it to the J&DR court *ex parte* with a sworn assertion that an *ex parte* order was necessary.

200. The Affidavit was the sole basis for the Emergency Removal Order and for the Protective Order that followed. Although Barksdale asked only for a protective order, the removal of A.S. from Plaintiffs' custody was a natural and foreseeable consequence of her sworn statements, and those statements were its proximate cause.

201. Barksdale's liability does not depend on whether she asked for removal. She supplied the sworn statements on which the court acted; she stood silent while the court acted on them; and she then accepted, announced to Plaintiffs, and exercised the custody the court awarded LDSS on their strength, for five days, without once returning to the court to correct what she had sworn. A complaining witness who learns that her affidavit has produced an *ex parte* deprivation

of custody, and who knows or has reason to know that the affidavit is false, has a duty to correct it. Barksdale did not.

202. The false statements and omissions were material. An *ex parte* order under Virginia law requires a showing that the child faces an imminent threat to life or health that cannot await an adversary hearing. Without the false statements, and with the omitted facts included, the Affidavit could not have supported any *ex parte* order, whether a protective order or a removal. Those facts were a child who had never been in the home and would remain in a hospital for weeks, photographs showing the home cluttered and then clean, a mother who had visited her child, and parents with no cognitive impairment. Plaintiffs would not have lost custody, and would not have been placed under any order, without notice and a hearing at which they could contest the allegations.

203. Barksdale had no evidence that A.S. had been abused or neglected or was in imminent danger, and no emergency justified proceeding without notice to Plaintiffs.

204. Barksdale knew when she swore to the Affidavit that A.S. had never been in the home and was not about to be discharged to it, and that the photographs in LDSS's own file showed none of the conditions she attributed to the home. She withheld both facts from the court.

205. The deprivation was real, not nominal. The hospital acted on the Emergency Removal Order the day it issued, removing Plaintiffs' names as the care partners responsible for their daughter and treating them thereafter as visitors rather than parents. For five days the parents of a child in intensive care had no legal authority over her treatment, and for several days after custody was restored the hospital, never told of the restoration, continued to treat them that way. Because the removal placed A.S. in LDSS's custody, it also converted a family assessment that

could have produced no finding against Plaintiffs into an investigation that produced a Founded disposition and a Central Registry listing.

206. Barksdale also failed to conduct any reasonable investigation before swearing to the Affidavit. That failure was an investigative act, not an act of advocacy.

207. Barksdale is not entitled to absolute immunity for the conduct alleged in this Count. Her personal attestation of facts in a sworn affidavit was the act of a witness, not of an advocate; her receipt and disregard of the photographs, her telephone calls, and her decision not to visit the home or speak with the mother were investigative acts; and her silence while the court acted on her sworn statements, and her acceptance and exercise of the custody that resulted, were neither advocacy nor the initiation of a proceeding. *See Kalina v. Fletcher*, 522 U.S. 118 (1997); *Malley v. Briggs*, 475 U.S. 335 (1986); *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993).

208. Barksdale's conduct was arbitrary, shocks the conscience, and violated rights that were clearly established in November 2024.

209. Barksdale acted intentionally, or with reckless or callous indifference to Plaintiffs' federally protected rights.

210. As a direct and proximate result, Plaintiffs suffered the injuries described above.

**COUNT II**
**42 U.S.C. § 1983 (First Amendment)**
**Criminal Contempt Prosecution for Refusing to Consent**
**(Against the Doe Defendants and the City)**

211. Plaintiffs incorporate the preceding paragraphs.

212. The First Amendment protects the right to refrain from speaking. It forbids the government to compel a person to express agreement or assent that he does not hold.

213. A person's consent, and a signature on a consent form, are expressions of assent. The signature LDSS demanded was not an acknowledgment of receipt or a ministerial formality. It

was an affirmative statement that Plaintiffs agreed to counseling and asked that it be funded, and LDSS wanted it precisely because of what it expressed: funds under the Children's Services Act could be released only on the parents' expressed agreement, and LDSS told the court that "as a result of their refusal, those services will not be funded." Each Plaintiff's refusal to make that statement, including Dr. Thomas Smitherman's refusal to sign LDSS's consent form, was protected by the First Amendment. *See Wooley v. Maynard*, 430 U.S. 705 (1977); *Janus v. AFSCME, Council 31*, 585 U.S. 878 (2018).

214. The City and the Doe Defendants caused both Plaintiffs to be charged with criminal contempt because of that refusal. The City's own motions identify the refusal to consent as the only violation charged.

215. The charged conduct was itself the protected expression. The charges were brought to punish Plaintiffs for withholding their consent and to coerce them into giving it. Plaintiffs do not complain here that LDSS asked the court to order a service they disputed; they complain that the City used a criminal prosecution to extract their own expressed agreement to it. The City's election to proceed by criminal contempt, rather than to ask the court to order any act, confirms that the object was to punish the refusal.

216. The contempt charges were not supported by probable cause. The Protective Order contained no express command to consent to counseling or to sign any document, and LDSS knew that Plaintiffs understood the order to require only that they admit LDSS to their home.

217. The J&DR court's statement on February 14, 2025 that the facts were sufficient does not establish probable cause. It was procured by the City's misrepresentation that the counseling was "Court Ordered" and "consistent with the Court's order," it was made without any finding of willfulness or any burden of proof, it was never entered as a finding or judgment, it was the

subject of a timely motion to reconsider, and it was superseded when the charges were dismissed. The City's liability under this Count arises from its decision in January 2025 to charge Plaintiffs with a crime for withholding consent, and from its decision to continue that prosecution after February 4, 2025, not from anything the J&DR court said on February 14.

218. A criminal contempt prosecution would deter a person of ordinary firmness from refusing to sign.

219. The City is liable because the decision to seek contempt sanctions was made or ratified by officials with final policymaking authority and was made pursuant to the customs and practices described above.

220. The Doe Defendants acted intentionally, or with reckless or callous indifference to Plaintiffs' federally protected rights.

221. As a direct and proximate result, Plaintiffs suffered the injuries described above.

**COUNT III**
**42 U.S.C. § 1983 (First Amendment)**
**Retaliation**
**(Against Defendant Barksdale, the Doe Defendants, and the City)**

222. Plaintiffs incorporate the preceding paragraphs.

223. In addition to the refusal described in Count II, Plaintiffs engaged in activity protected by the First Amendment, including:

(a) Dr. Thomas Smitherman's statements to Barksdale on November 13, 2024 that he would not answer her questions without an attorney and that his daughter's medical condition was not her business;

(b) Plaintiffs' refusal to consent to genetic testing of themselves and to psychological testing, and their objections to LDSS's demands;

(c) Plaintiffs' administrative appeal of the Founded disposition; and

(d) Plaintiffs' requests, through counsel, that the City dismiss the proceedings, and their notice of intent to sue.

224. Defendants took adverse action against Plaintiffs that would deter a person of ordinary firmness from exercising those rights. Barksdale sought an *ex parte* order against Plaintiffs within hours of Dr. Thomas Smitherman's refusal to answer her questions, and recited that refusal in her Affidavit as a fact necessitating the order. LDSS cited Plaintiffs' refusal of psychological testing as a ground for the Founded disposition. The City and the Doe Defendants sought criminal, not civil, contempt sanctions while Plaintiffs' appeal was pending, and continued the proceedings, subpoenaed Dr. Valerie Smitherman's medical records, and continued to demand services after Plaintiffs prevailed on that appeal and asked that the case be dismissed.

225. Plaintiffs' protected activity was a substantial and motivating cause of those actions, as shown by their timing and by Defendants' own statements, including LDSS's statement that Plaintiffs' "lack of cooperation" at the beginning of the investigation led to court involvement.

226. The City is liable for these actions because they were taken or ratified by officials with final policymaking authority and pursuant to the customs and practices described above.

227. Barksdale and the Doe Defendants acted intentionally, or with reckless or callous indifference to Plaintiffs' federally protected rights.

228. As a direct and proximate result, Plaintiffs suffered the injuries described above.

**COUNT IV**
**42 U.S.C. § 1983 (Fourteenth Amendment)**
**Coerced Consent to Counseling and Continued Interference With Parental Rights After the Agency's Reversal**
**(Against the Doe Defendants and the City)**

229. Plaintiffs incorporate the preceding paragraphs.

230. Plaintiffs have a liberty interest, protected by the Due Process Clause of the Fourteenth Amendment, in refusing mental health counseling that they do not want and that no professional

has found they need. Consent given under threat of jail is not consent. The City and the Doe Defendants used a criminal contempt prosecution to coerce Plaintiffs' consent to such counseling.

231. Plaintiffs were prosecuted for contempt without fair notice. The Protective Order did not tell them that withholding consent to counseling, or declining to sign a consent form, was forbidden, and LDSS knew that they understood it otherwise. As the City sought and enforced it, the Protective Order left to LDSS, the party prosecuting Plaintiffs, the power to define after the fact, and without any limit of reasonableness, what Plaintiffs could be jailed for refusing. The contempt charges were prosecuted by the City's own attorney, for the City's benefit.

232. By February 4, 2025 at the latest, the City and the Doe Defendants knew that the allegations on which the abuse and neglect petition rested were unfounded: LDSS had conceded in November 2024 that Plaintiffs do not have cognitive delays and that Dr. Valerie Smitherman had visited her child; Barksdale had seen in December 2024 that the home was clean; and LDSS's Deputy Director had overturned the finding of neglect after a hearing.

233. With that knowledge, and after written notice from Plaintiffs' counsel, the City and the Doe Defendants continued until March 28, 2025 to maintain the petition and the Protective Order, with its authorization of entries into Plaintiffs' home, its prohibition on purchasing or transporting firearms, and its listing of Plaintiffs in the Virginia Criminal Information Network; to prosecute criminal contempt charges; to compel Plaintiffs' attendance at the March 11, 2025 meeting; to demand that Plaintiffs admit a service provider into their home to assess them; to inspect their home on March 19, 2025; and to seek Dr. Valerie Smitherman's medical records. Each of those was a concrete deprivation imposed on Plaintiffs after the City knew there was no basis for any of them.

234. That conduct served no legitimate governmental interest in protecting A.S. It was arbitrary, shocks the conscience, and deprived Plaintiffs of their liberty without due process of law, including their fundamental liberty interest in the care, custody, and management of their child and in the privacy and integrity of their family and home.

235. The City is liable because the decisions to seek contempt sanctions and to continue the proceedings were made or ratified by officials with final policymaking authority, and because the violation was caused by the customs, practices, and failures to train and supervise described above.

236. The Doe Defendants acted intentionally, or with reckless or callous indifference to Plaintiffs' federally protected rights.

237. As a direct and proximate result, Plaintiffs suffered the injuries described above.

**COUNT V**
**42 U.S.C. § 1983 (Municipal Liability)**
**(Against the City)**

238. Plaintiffs incorporate the preceding paragraphs.

239. The constitutional violations alleged in Counts I through IV were caused by the City's customs and practices, by its failure to train and supervise its child-protective employees, and by the decisions of its officials with final policymaking authority, as described above.

240. Those customs, practices, failures, and decisions were the moving force behind the violations of Plaintiffs' rights.

241. The City is therefore liable for those violations under 42 U.S.C. § 1983. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978).

242. As a direct and proximate result, Plaintiffs suffered the injuries described above.

## COUNT VI
## Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*
## (Against the City)

243. Plaintiffs incorporate the preceding paragraphs.

244. The City is a public entity. Its child-protective investigations, dispositions, services, and court proceedings are services, programs, or activities of a public entity within the meaning of 42 U.S.C. § 12132.

245. Dr. Valerie Smitherman is an individual with a disability within the meaning of 42 U.S.C. § 12102(1)(C) because the City regarded her as having a cognitive or mental impairment. The City formed that perception because she has cerebral palsy and because of the common but false assumption that cerebral palsy is accompanied by cognitive deficit. Plaintiffs' claims under this Count rest on that perception, not on the physical effects of cerebral palsy.

246. Dr. Thomas Smitherman is an individual with a disability within the meaning of 42 U.S.C. § 12102(1)(C) because the City regarded him as having a cognitive or mental impairment. The City formed that perception on the basis of no evaluation, no observation, and no report of any impairment, and in part because of his relationship and association with his wife, a person whom it regarded as impaired. 28 C.F.R. § 35.130(g).

247. The City never identified the impairment it perceived, never alleged that it limited any major life activity, and never alleged that it was anything more than a "concern." Before the ADA Amendments Act of 2008, a person in Plaintiffs' position could not state a claim, because a "regarded as" plaintiff was required to show that the defendant perceived an impairment that substantially limited a major life activity. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). The ADA Amendments Act abrogated that requirement: an individual is now regarded as having an impairment "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A); Pub. L. No. 110-325, § 4 (2008).

248. Plaintiffs' claims under this Count were therefore made possible by, and arise under, an Act of Congress enacted after December 1, 1990, and are governed by the four-year limitations period of 28 U.S.C. § 1658(a). *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). This action is timely as to every act alleged.

249. Each Plaintiff is a qualified individual with a disability. Each is a parent who was entitled to be free from intervention in the family except on the same terms as a parent without a disability, and who met the essential eligibility requirements to participate in and benefit from the City's child welfare programs.

250. The City, by reason of disability, subjected Plaintiffs to discrimination and denied them the benefits of its services, programs, and activities, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130, by:

(a) citing Dr. Valerie Smitherman's cerebral palsy, and presumed "cognitive delays" on the part of both Plaintiffs, as grounds for court intervention in their family;

(b) demanding that both Plaintiffs submit to psychological testing "to evaluate cognitive ability" as a condition of retaining unrestricted custody of their child;

(c) basing the Founded disposition on speculation about Plaintiffs' "mental health" and on their refusal to submit to psychological testing;

(d) demanding that both Plaintiffs undergo counseling, and prosecuting them for contempt when they would not consent to it, without any individualized assessment that either of them needed it;

(e) making decisions about Plaintiffs' fitness as parents on the basis of stereotypes and generalizations about people with disabilities rather than an individualized assessment based on objective evidence; and

(f) imposing criteria and methods of administration that screened out, or tended to screen out, parents with disabilities from the full and equal enjoyment of family integrity. 28 C.F.R. § 35.130(b)(3), (b)(8).

251. The City acted intentionally or with deliberate indifference to Plaintiffs' federally protected rights. Its employees knew that their statements about Plaintiffs' cognitive ability and mental health had no factual basis, and the City persisted in its course after conceding in court that Plaintiffs do not have cognitive delays.

252. As a direct and proximate result, Plaintiffs suffered the injuries described above and are entitled to relief under 42 U.S.C. § 12133.

**COUNT VII**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(Against the City)**

253. Plaintiffs incorporate the preceding paragraphs.

254. The City's child welfare programs and activities receive federal financial assistance.

255. Each Plaintiff is a qualified individual with a disability within the meaning of 29 U.S.C. § 705(20)(B), which incorporates the definition of disability in 42 U.S.C. § 12102 as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, § 7. Plaintiffs' claims under this Count rest on the same "regarded as" theory as Count VI, were made possible by the same 2008 enactment, and are governed by the same four-year limitations period. 28 U.S.C. § 1658(a).

256. The City, solely by reason of disability, subjected Plaintiffs to discrimination under, and denied them the benefits of, its child welfare programs and activities, by the conduct described in Count VI.

257. The City's conduct also violated the regulations implementing Section 504 in child welfare programs, which prohibit decisions based on speculation, stereotypes, or generalizations

that a parent with a disability cannot safely care for a child, and which require that assessments of parents be individualized and based on the best available objective evidence. 45 C.F.R. § 84.60.

258. The City acted intentionally or with deliberate indifference to Plaintiffs' federally protected rights.

259. As a direct and proximate result, Plaintiffs suffered the injuries described above and are entitled to relief under 29 U.S.C. § 794a.

**COUNT VIII**
**Malicious Prosecution (Virginia Law)**
**(Against Defendant Barksdale and the Doe Defendants)**

260. Plaintiffs incorporate the preceding paragraphs.

261. Barksdale instituted the abuse and neglect proceeding against Plaintiffs by swearing to and filing the petition and Affidavit. The Doe Defendants, and on information and belief Barksdale, instituted, procured, or cooperated in the contempt charges against Plaintiffs and in the continuation of both proceedings after February 4, 2025.

262. Those proceedings were instituted and continued without probable cause. The abuse and neglect petition rested on statements that were false and unverified, that LDSS's own photographs did not support, and that concerned a home the child had never entered. The contempt charges rested on a refusal to consent that no order forbade, and were brought under a criminal statute.

263. The J&DR court's statement on February 14, 2025 that the facts were sufficient does not establish probable cause for the contempt charges. It was procured by the City's misrepresentation that the counseling was court-ordered, was made without any finding of willfulness or any burden of proof, was never entered as a finding or judgment, was the subject of a timely motion to reconsider, and was superseded by the dismissal of the charges.

264. Those proceedings were instituted and continued with malice, in that they were pursued for purposes other than a good-faith effort to protect A.S., including to punish Plaintiffs for refusing to answer questions and to submit to testing, and to compel their submission to LDSS's demands. LDSS's indifference to whether the removal rested on truth, accepting custody of a hospitalized infant on an affidavit it did not correct, and leaving the removal in place for five days, is further evidence that protecting A.S. was not the object.

265. Both proceedings terminated in a manner not unfavorable to Plaintiffs. The Protective Order was dissolved on LDSS's own motion without any adjudication of abuse or neglect, an abandonment of the proceeding by the party that brought it, and the contempt charges were dismissed.

266. The contempt charges were criminal proceedings under Va. Code § 18.2-456, and no showing of special injury is required as to them. As to the abuse and neglect proceeding, Plaintiffs suffered injury beyond the ordinary burdens of litigation: the seizure of legal custody of their child; restraints on their liberty and on the use of their home under the Protective Order; a prohibition on purchasing or transporting firearms and listing in the Virginia Criminal Information Network; recognizances to appear on pain of fine and jail; and exposure to incarceration.

267. Barksdale and the Doe Defendants acted in bad faith and with malicious intent, and are not entitled to immunity under Va. Code § 63.2-1512.

268. As a direct and proximate result, Plaintiffs suffered the injuries described above.

**COUNT IX**
**Abuse of Process (Virginia Law)**
**(Against Defendant Barksdale and the Doe Defendants)**

269. Plaintiffs incorporate the preceding paragraphs.

270. Barksdale and the Doe Defendants used the process of the J&DR court, including the Protective Order, the show-cause process, and a subpoena *duces tecum*, for an ulterior purpose: to extract Plaintiffs' signature on a consent form that no order required them to sign, to compel Plaintiffs to submit to psychological testing, counseling, and in-home services that LDSS had no lawful basis to require, to obtain Dr. Valerie Smitherman's medical records, and to punish Plaintiffs for refusing LDSS's demands and for appealing its finding.

271. They committed acts in the use of that process that were not proper in the regular prosecution of the proceedings. After the J&DR court stated on February 14, 2025 that the facts were sufficient for contempt but withheld any finding, LDSS used the pending charges as leverage outside the courtroom: at the March 11, 2025 meeting, it convened what it called a "service review" for the stated purpose of obtaining Plaintiffs' consent to services, and demanded that consent while the criminal charges remained open over Plaintiffs, as the price of their resolution. That is the use of criminal process to compel a civil concession, not the prosecution of a contempt charge to its conclusion. LDSS likewise used the pendency of the proceedings to issue a subpoena for the whole of Dr. Valerie Smitherman's medical records on an issue it had abandoned, after it had conceded the falsity of its allegations and after its Deputy Director had overturned the finding of neglect.

272. Barksdale and the Doe Defendants acted in bad faith and with malicious intent.

273. As a direct and proximate result, Plaintiffs suffered the injuries described above.

**COUNT X**
**Tortious Interference With Parental Rights (Virginia Law)**
**(Against Defendant Barksdale and the Doe Defendants)**

274. Plaintiffs incorporate the preceding paragraphs.

275. Virginia recognizes a cause of action for tortious interference with parental rights. *Wyatt v. McDermott*, 283 Va. 685 (2012). A parent may recover from a third party who

intentionally interferes with the parent's parental or custodial relationship with a minor child, by removing or detaining the child from the parent or by otherwise preventing the parent from exercising parental or custodial rights, where the interference causes harm to that relationship and damages result.

276. At all relevant times, Plaintiffs were the parents of A.S. and held full parental and custodial rights with respect to her. No court had ever limited those rights before November 13, 2024.

277. Barksdale intentionally interfered with Plaintiffs' parental and custodial relationship with A.S. She swore to an Affidavit containing statements she knew to be false or unverified, and omitting facts she knew would have defeated her application, for the purpose of obtaining an *ex parte* court order placing Plaintiffs' newborn daughter under the control of LDSS. She stood silent while the court, on the strength of her sworn statements, removed A.S. from Plaintiffs' legal custody and awarded that custody to LDSS. She then announced the removal to Plaintiffs, and LDSS accepted and exercised the custody it had been awarded, for five days, without any effort to correct the record.

278. Barksdale and the Doe Defendants further interfered with Plaintiffs' parental rights by maintaining, for more than four months, a Protective Order under which A.S. could be released from the hospital "only to a home deemed appropriate by LDSS," under which Plaintiffs were required to admit LDSS and its designees into their home and to submit to services LDSS chose, and under which LDSS, not Plaintiffs, decided what Plaintiffs must do to keep their daughter at home; by entering and maintaining a Founded disposition of neglect against each Plaintiff that LDSS's own Deputy Director later overturned; by demanding that Plaintiffs undergo psychological testing and counseling as a condition of unrestricted custody; and by prosecuting

Plaintiffs for criminal contempt, and continuing to do so after February 4, 2025, to compel their submission.

279. Those acts were intentional. Each was a deliberate choice, made with knowledge of the facts set out above, to displace Plaintiffs from the control of their daughter's custody, care, and medical treatment and to substitute LDSS's judgment for theirs.

280. Defendants did not act on a reasonable, good-faith belief that interference with Plaintiffs' parental relationship was necessary to protect A.S. from physical, mental, or emotional harm. A.S. was under round-the-clock hospital care sixty miles from Plaintiffs' home and had never been in it. LDSS's own photographs showed the home cluttered on November 7 and clean on November 11, 2024, and showed none of the conditions Barksdale swore to. LDSS conceded within five days that Plaintiffs have no cognitive delays and that Dr. Valerie Smitherman had visited her child, and it conceded within three months that the home was suitable, that Plaintiffs have no cognitive impairments, and that A.S. had never been denied necessary care. No reasonable person in Defendants' position, knowing what they knew, could have believed that separating A.S. from her parents' custody, or conditioning her return home on Plaintiffs' submission to LDSS, was necessary to protect her.

281. Defendants did not act pursuant to any judicial determination that Plaintiffs were unfit or that A.S. was abused or neglected. No such determination was ever made. The orders under which Defendants acted were procured by Barksdale's sworn statements, were entered *ex parte* or without any adversarial finding, and were dissolved on LDSS's own motion.

282. Defendants' interference caused harm to Plaintiffs' parental and custodial relationship with A.S. During the first months of their daughter's life, Plaintiffs were stripped of legal custody of her, were erased as the persons the hospital recognized as her care partners, were

denied the authority to direct her medical care, were made subject to LDSS's approval before she could come home, were required to open their home to LDSS and its designees, were branded as having neglected her in a disposition and a registry entry that no family assessment could have produced, and were prosecuted for declining to submit to services LDSS chose for them.

283. As a direct and proximate result, Plaintiffs suffered damages, including the expenses they incurred in seeking the return of their daughter and the restoration of their parental rights, the loss of their daughter's companionship and of the ordinary incidents of parenthood during that period, and severe mental anguish.

284. Barksdale and the Doe Defendants acted in bad faith and with malicious intent, and are not entitled to immunity under Va. Code § 63.2-1512. Their conduct was willful and wanton and in conscious disregard of Plaintiffs' rights, warranting an award of punitive damages.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally where permitted by law, and award:

A. a declaration that Defendants violated Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

B. compensatory damages in an amount to be determined at trial;

C. punitive damages against Defendant Barksdale and the Doe Defendants in an amount to be determined at trial;

D. Plaintiffs' reasonable attorney's fees and costs under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b);

E. pre-judgment and post-judgment interest as allowed by law; and

F. such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 10, 2026

Respectfully submitted,

VALERIE HANNON SMITHERMAN and
THOMAS SMITHERMAN

By Counsel

/s/ M. Paul Valois
M. Paul Valois (VSB No. 72326)
JAMES RIVER LEGAL ASSOCIATES
7601 Timberlake Road
Lynchburg, Virginia 24502
Telephone: (434) 845-4529
Facsimile: (434) 845-8536
mvalois@vbclegal.com
*Counsel for Plaintiffs*